IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DANNY L. VAUGHN,                )
                               )
            Plaintiff,         )
                               )
    v.                         )    Case No.
                               )    05-3211-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,            )
                               )
            Defendant.         )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Danny Vaughn seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's back impairment does not meet a listed impairment, (2) finding that plaintiff's cardiac impairment does not meet a listed impairment, (3) failing to order additional mental tests, (4) failing to properly analyze plaintiff's credibility, and (5) failing to properly consider the combined effect of plaintiff's impairments. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On August 18, 2003, plaintiff applied for disability benefits alleging that he had been disabled since July 1, 1999. Plaintiff's disability stems from back pain and depression. Plaintiff's application was denied on October 23, 2003. On August 18, 2004, a hearing was held before an Administrative Law Judge. On November 5, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On March 25, 2005, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the

2

entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant

work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

4

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1971 through 2004:

5

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1971 | $      21.15 | 1988 | $ 5,367.00 |
| 1972 | 202.40 | 1989 | 3,450.00 |
| 1973 | 1,253.83 | 1990 | 0.00 |
| 1974 | 423.55 | 1991 | 9,240.00 |
| 1975 | 346.87 | 1992 | 10,002.50 |
| 1976 | 0.00 | 1993 | 14,852.75 |
| 1977 | 0.00 | 1994 | 0.00 |
| 1978 | 0.00 | 1995 | 0.00 |
| 1979 | 0.00 | 1996 | 0.00 |
| 1980 | 0.00 | 1997 | 0.00 |
| 1981 | 6,161.64 | 1998 | 0.00 |
| 1982 | 7,619.60 | 1999 | 0.00 |
| 1983 | 554.40 | 2000 | 0.00 |
| 1984 | 0.00 | 2001 | 0.00 |
| 1985 | 4,344.00 | 2002 | 0.00 |
| 1986 | 2,088.00 | 2003 | 0.00 |
| 1987 | 1,091.00 | 2004 | 0.00 |

(Tr. at 52-68).

**B.    *SUMMARY OF MEDICAL RECORDS***

On February 8, 1999, plaintiff was seen at the Lebanon Family Practice for sinus congestion and a cough (Tr. at 220).  The doctor diagnosed bronchitis in a smoker and told plaintiff to quit smoking.  The doctor prescribed Trovan [an

6

antibiotic] for ten days, Proventil inhaler[1] as needed, and told plaintiff to increase fluids.

On February 10, 1999, plaintiff was seen at the Lebanon Family Practice for dizziness and cough (Tr. at 219). He denied any chest pain. The doctor diagnosed sinusitis and bronchitis and continued plaintiff on his medications.

On June 23, 1999, plaintiff was seen at the Lebanon Family Practice complaining of low back pain radiating into his legs for the past two months (Tr. at 217). Straight leg raising was negative. The doctor diagnosed acute low back pain and prescribed Flexeril [muscle relaxer], Relafen [a non-steroidal anti-inflammatory], and Ultram [pain reliever].

Plaintiff's alleged onset date of disability is July 1, 1999.

On July 7, 1999, plaintiff was seen at the Lebanon Family Practice for a recheck of his back pain (Tr. at 216). Plaintiff stated that his legs were still numb and it hurt to move. Flexion[2] was limited to 20°. The doctor diagnosed

------

[1]A bronchodilator which relaxes muscles in the airways to improve breathing.

[2]The doctor does not elaborate on the flexion test. Lumbar flexion is bending forward at the waist, and a normal measurement is 90°. Lateral flexion is bending side to side

back pain and continued plaintiff on his same medications.

On March 13, 2002, plaintiff saw nurse Vicki Maness in the Department of Corrections[3] (Tr. at 212). Plaintiff complained that his legs hurt at night when he sleeps and they go numb at times. Ms. Maness observed that plaintiff's ambulation was normal, his gait was steady, he was able to sit and rise from the chair without difficulty. She recommended over-the-counter ibuprofen.

On March 19, 2002, plaintiff saw technician Molly Schumann in the Department of Corrections (Tr. at 206). "He reports he is unable to read or write and presented in tearful manner because he had received a letter from his wife and was afraid to ask for help reading it. He is a 45 year old MWM serving 7 years for sales of meth. He was returned from probation after receiving 7 field violations since 1999. He reports he quit using meth 2 years ago. . . . He has never received mental health treatment. . . . His

_____

at the waist, and a normal measurement is 25°.

[3]The medical records from the Department of Corrections were extremely difficult to sort through. They are not in any order, and in most instances, a record that covers more than one page is split and the two halves appear many pages apart in the record with no date on the second page. It is as though someone threw hundreds of pages of records into the air and then shuffled them into a stack.

intellectual functioning appears below average. He has poor insight and judgement." Ms. Schumann recommended plaintiff be evaluated by a psychiatrist.

On May 29, 2002, plaintiff saw Dr. Lynn Hauenstein in the Department of Corrections (Tr. at 198-199). Plaintiff reported that he was doing OK until he was forced to climb over seats in a van while restrained and then felt his back pop. He then noted numbness when standing for a long time and he was having trouble climbing up to the top bunk. Straight leg raising was positive at 5 degrees on the right and 15 degrees on the left. Dr. Hauenstein assessed low back pain with radiculopathy [pain in the legs] and recommended Naproxen [non-steroidal anti-inflammatory], and imposed the following restrictions: no lifting over ten pounds, low bunk, low walk.

On June 5, 2002, plaintiff saw Dr. Qasim Bajwa in the Department of Corrections (Tr. at 199). Dr. Bajwa reviewed plaintiff's June 5, 2002, CT scan of the lumbar spine. Dr. Bajwa assessed advanced changes of disc degeneration at L3/L4, L4/L5 and to a lesser degree at L5/S1. The disc spaces were reduced, prominent anterior hypertrophic spurs[4]

_____

[4]A projection from a bone.

were noted. Degenerative changes were also present involving facet joints at the lumbosacral junction. "Loss of normal lumbar curve is probably due to muscle spasm. No other significant findings are seen." Dr. Bajwa's impression was:

1) Changes of chronic disc degeneration at L3/L4 and L4/L5 and minimal at L5/S1.

2) Loss of normal lumbar curve lumbar curve/muscle spasm and degenerative changes involving facet joints at lumbosacral junction.

On June 25, 2002, plaintiff saw Dr. Mia Galioto in the Department of Corrections (Tr. at 185). Plaintiff said he was stable on his medication, but had chronic pain that kept him awake. Dr. Galioto assessed major depressive disorder and prescribed Trazodone [an anti-depressant also used to treat insomnia].

On June 28, 2002, plaintiff saw Dr. Lynn Hauenstein in the Department of Corrections (Tr. at 192-193). Plaintiff reported that he was forced to climb over seats in a van coming to the correctional facility and then developed pain in his left leg. Dr. Hauenstein assessed lumbar pain with radiculopathy [pain in the legs]. "He has signed up for reading classes and seems highly motivated to learn to read

10

but sitting may be a problem for him. . . . Results of CT discussed with Dr. Kramer. The CT shows changes of chronic disc degeneration with mild post disc herniation[5] and spinal canal stenosis[6]. . . . Since o/f[7] was slightly improved at this exam Dr. Kramer felt rechecking o/f and reviewing old record would be of benefit before MRI added on 7/12/02." In a referral request, Dr. Hauenstein wrote, "He had been symptom free until forced to climb over seats in transfer bus from FRDC. Positive straight leg raise at 5-10 degrees on left, can't raise up on toes." Dr. Kramer then wrote, "Lynn, as per our conversation this date his symptoms are improved and the CT has ben evaluated. If he should have continued complaints I will be more than glad to evaluate

---

[5]As a disc degenerates, it can herniate (the inner core extrudes) back into the spinal canal, which is known as a disc herniation (or a herniated disc). The weak spot in a disc is directly under the nerve root, and a herniated disc in this area puts direct pressure on the nerve, which in turn can cause pain to radiate all the way down the patient's leg to the foot.

[6]The lumbar spinal canal is the space in the lower spine that carries nerves to the legs. It is very narrow. It gets even more narrow if the bone and tissue around it grow over the course of many years. This narrowing is called "stenosis." As the lumbar spinal canal narrows, the nerves that go through it are squeezed. This squeezing may cause back pain, and leg pain and weakness.

[7]I assume this refers to "offender".

him at a later date."

On September 17, 2002, plaintiff saw Dr. Mia Galioto in the Department of Corrections (Tr. at 177, 184). Plaintiff reported that he was sleeping well except for dreams he believed were caused by his Trazodone. His energy level was appropriate and his anxiety was controlled. No hopelessness or worthlessness. Dr. Galioto assessed major depressive disorder and discontinued plaintiff's Trazodone per plaintiff's request.

On October 17, 2002, plaintiff saw technician Larry Cloninger in the Department of Corrections (Tr. at 177). Plaintiff reported that he was taking his medication and had no mental health issues.

On November 11, 2002, plaintiff saw nurse Katherine Barton in the Department of Corrections (Tr. at 31-32). He complained of back pain. "I bent over Saturday to pick up a cigarette and I guess I hurt my back." His range of motion was within acceptable limits. Ms. Barton recommended he restrict sports and weight lifting for five days.

On November 19, 2002, plaintiff saw Dr. Lynn Hauenstein in the Department of Corrections (Tr. at 176). He reported accidentally bending over with a shooting pain down his legs. Dr. Hauenstein assessed bilateral lumbar

12

radiculopathy [pain in the lower back and legs] and recommended plaintiff put a coat under his knees when supine and between his knees when he is lying on his side.

On December 10, 2002, plaintiff saw Dr. Mia Galioto in the Department of Corrections (Tr. at 169-174).  Plaintiff reported that he was stable on his medication.  "He does have some chronic leg pain which keeps him awake.  Energy level is appropriate.  "He is able to control and direct his thoughts.  Reality testing is intact.  No hallucinations or delusions, no paranoia.  He is satisfied with his meds, compliant, and has no side effects."  Dr. Galioto assessed major depressive disorder, GAF of 55[8].  She recommended he continue on the same medication and follow up in 12 weeks.

On December 13, 2002, plaintiff saw technician Larry Cloninger in the Department of Corrections (Tr. at 174).  Plaintiff reported "no mental/emotional issues at this time."  He reported the current treatment regimen including medication was effective.

_____

[8]A Global Assessment of Functioning ("GAF") of 51-60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

13

On December 18, 2002, plaintiff saw nurse Cheryl Drought in the Department of Corrections (Tr. at 148, 167). He complained that his back hurt. Nurse Drought observed that plaintiff's gait was steady with appropriate pattern, he had equal strength in his extremities, and his range of motion was within acceptable limits.

On January 7, 2003, plaintiff saw Dr. Thomas Kramer in the Department of Corrections (Tr. at 170-171). Plaintiff reported pain in his low back and both legs. Flexion and extension[9] of the lumbar spine was "severely limited". Lateral side bending was limited. Toe and heel walking was within normal limits, straight leg raising on the left and right was within normal limits. Plaintiff had no apparent atrophy. Dr. Kramer assessed postural imbalance, lumbar spine, and post laminectomy syndrome [chronic back pain after laminectomy surgery]. He recommended a lumbar support with good abdominal control and physical therapy for postural balance exercises.

On January 19, 2003, plaintiff attended physical therapy through the Department of Corrections (Tr. at 147). "Complete active range of motion on both lower extremities.

_____

[9]Flexion is bending forward at the waist, extension is bending backward at the waist.

14

He has difficulty to carry out bridging activities and short arc quads, which could be attributed to minimal tightness of hamstrings.  He is able to carry out trunk flexion and extension together with lateral flexion of which all movements are accompanied by pain.  He has good muscle power to both upper extremities and both lower extremities. . . No remarkable loss of balance. . . .  Patient has increased difficulty tolerating prolonged sitting or prolonged standing.  According to him, he cannot tolerate any position when sleeping.  He is functionally able with activities of daily living."

On January 20, 2003, plaintiff saw Dr. Lynn Hauenstein in the Department of Corrections (Tr. at 165).  She discussed with plaintiff the need for exercises.  She advised him to perform postural balance exercises and use a lumbar support.  "Go to gym and work on strengthening abdominal wall muscles".

On January 23, 2003, plaintiff saw Larry Cloninger in the Department of Corrections (Tr. at 169).  Plaintiff reported no mental/emotional issues, he said his current treatment regimen including medication was effective.  "Is dealing with chronic pain at the present time."

15

On February 3, 2003, plaintiff was fitted for a lumbar support (Tr. at 163).

On February 21, 2003, plaintiff saw nurse Stephanie Noble in the Department of Corrections (Tr. at 159, 162). Plaintiff complained that his back hurt, and that his symptoms had started in January 2003. Ms. Noble observed that plaintiff's gait was steady with appropriate pattern, he had equal strength in his extremities, his range of motion was within acceptable limits. He was taking Acetaminophen (Tylenol). She recommended that he restrict sports and weight lifting for five days.

On February 27, 2003, plaintiff saw Dr. Ross Sciara in the Department of Corrections (Tr. at 157). Heel toe walking was normal, negative patellar reflexes [knee jerk], palpatory pain over the L3-L5 area. Dr. Sciara's assessment was chronic lumbar degenerative joint disease. He recommended Ibuprofen.

On March 11, 2003, plaintiff saw Dr. Jay Barone in the Department of Corrections (Tr. at 156). "I spoke to the patient at length about his treatment history. The patient does not even known why he is on Paxil[10] and would like to

---

[10]Treats depression and anxiety.

16

get off all his psych meds. I informed him that Pamelor [antidepressant] may be better for the chronic back pain". Dr. Barone discontinued the Paxil but continued the Vistaril [treats anxiety] and prescribed Pamelor.

On March 14, 2003, plaintiff saw nurse Jessica Goppert in the Department of Corrections (Tr. at 154-155). He complained that his back hurt. Range of motion was within acceptable limits. Nurse Goppert referred plaintiff to a doctor.

On March 20, 2003, plaintiff saw Dr. Ross Sciara in the Department of Corrections (Tr. at 151). His patellar reflex [knee jerk] was normal bilaterally, range of motion was reduced to 50% [the records do not indicate what range of motion was reduced], heel and toe walking was normal, posture was normal. Dr. Sciara diagnosed chronic lumbar strain and degenerative joint disease.

On April 7, 2003, plaintiff saw Dr. Jay Barone in the Department of Corrections (Tr. at 136, 153). "He looks calm and reports doing very well. He is not anxious and has no feelings of harm to self or others. The patient reports he is ready for the next reduction in medication." Dr. Barone diagnosed a history of amphetamine abuse and dependence and amphetamine induced anxiety. He discontinued plaintiff's

17

Vistaril but continued his Pamelor.

On April 8, 2003, plaintiff saw Dr. Brent Colgan in the Department of Corrections (Tr. at 149-150). He complained of a history of back problems "yet no significant pain since '90." Plaintiff said he had a fall last February and twisted his back. He said he experienced pain with standing longer than ten minutes. Dr. Colgan found that plaintiff's trunk range of motion flexion was decreased 25%, extension was decreased 50%. Dr. Colgan's assessment included "pain and deconditioning". He recommended plaintiff follow up with physical therapy to promote range of motion and trunk strength.

On April 10, 2003, plaintiff saw nurse Stephanie Noble in the Department of Corrections (Tr. at 146). He requested that a copy of his medical records be sent to his attorney.

On April 17, 2003, plaintiff saw nurse Stephanie Noble in the Department of Corrections (Tr. at 144). Plaintiff said he thought he injured his back further two days ago but that the day before it popped and felt better.

On May 6, 2003, plaintiff saw nurse Paula Lutz in the Department of Corrections (Tr. at 139, 142). She noted that he had smoked two packs of cigarettes per day for the past 20 years.

18

On May 16, 2003, plaintiff saw Dr. Jay Barone in the Department of Corrections (Tr. at 136). "Patient reports he like[s] the Pamelor [an anti-depressant also used to aid smoking cessation] very much and he feels that it helps with his mood and back pain." Plaintiff had no side effects. Dr. Barone assessed amphetamine abuse, depression and anxiety induced disorder and back pain.

On May 29, 2003, plaintiff saw Dr. Ross Sciara in the Department of Corrections (Tr. at 134, 138). Plaintiff complained of pain in the lumbosacral area. He had muscle spasms and point tenderness at L5-S1. Dr. Sciara prescribed extension and flexion exercises, aerobic exercises, rest for 72 hours then return to normal activity. He told plaintiff to stop smoking. He recommended acetaminophen (Tylenol).

On June 2, 2003, plaintiff had x-rays of his lumbar spine (Tr. at 134-135). "There is a mild levoscoliosis[11] present within the lower lumbar spine. Hypertrophic [a general increase in bulk] degenerative changes are seen at the anterior diskovertebral margins of L2-L3 through L4-L5. Vertebral bodies and disk spaces are intact. Neuroforamina [root canals] are patent [open or exposed] without evidence

---

[11]A curve in the spine that points to the left.

19

of encroachment [reduced]."

On June 8, 2003, plaintiff saw nurse Deloris Hoover in the Department of Corrections (Tr. at 132-133, 135). Plaintiff complained of having chest pain. Nurse Hoover noted that plaintiff was a smoker and was overweight. He reported no anxiety or restlessness. Nurse Hoover wrote, "Offender is not having chest pain at this [time]. Has had chest pain several times in past month, with dizziness, as charged. EKG completed, normal."

On June 9, 2003, plaintiff saw Dr. Jay Barone in the Department of Corrections (Tr. at 136). He reported the Pamelor was working "very well" for him. He was sleeping better and had no complaints of adverse effects. Plaintiff's mood was better. Dr. Barone assessed a long history of methamphetamine abuse and depression. "The patient is happy with his current dose of Pamelor. Plan [to] continue Pamelor 25 mg".

On June 17, 2003, plaintiff saw Dr. Ross Sciara in the Department of Corrections (Tr. at 133). "Chest pain in the past but has resolved lately." Plaintiff's exam was normal. Dr. Sciara assessed chest wall pain resolved and prescribed Ibuprofen.

On June 28, 2003, plaintiff saw nurse Jessica Goppert in the Department of Corrections (Tr. at 130).  Plaintiff reported having a lot of pain in his right leg.  He was taking ibuprofen but it was not helping all the time.  Nurse Goppert observed that plaintiff walked without difficulty, and no limitations were noted.

On July 8, 2003, plaintiff saw Dr. Jay Barone in the Department of Corrections (Tr. at 129).  Plaintiff reported he was doing well and had "few symptoms of depression". Plaintiff had no side effects from his medication.  He did report some back pain.  Dr. Barone assessed long history of methamphetamine abuse and depression.

On July 10, 2003, plaintiff saw Dr. Ross Sciara in the Department of Corrections (Tr. at 131).  Plaintiff complained of pain in the right lumbar region and down the right leg.  Plaintiff's exam was normal.  He had normal patellar reflex and normal heel-toe walking.  Dr. Sciara's assessment was chronic lumbar strain.  He prescribed Naproxen, a non-steroidal anti-inflammatory.

On August 4, 2003, plaintiff saw Dr. Jay Barone in the Department of Corrections (Tr. at 125).  Plaintiff reported he felt good and was having no side effects from his medication.  He was sleeping well.  Plaintiff was happy

about his release from prison in six days.  Dr. Barone
assessed long time methamphetamine abuse; mood disorder not
otherwise specified, much improved.

On August 12, 2003, plaintiff saw nurse Sami Yerganian
in the Department of Corrections (Tr. at 125-126).  He
attended a discharge planning group.  "Identified ways to
access needed mental health services.  Offender was provided
a list of Missouri Department of Mental Health designated
treatment facilities, complete with addresses and phone
numbers."

On August 18, 2003, plaintiff applied for disability
benefits.

On August 22, 2003, plaintiff was seen at the Lebanon
Family Practice for a check up (Tr. at 213).  He complained
of back pain.  Straight leg raising was positive on the
left.  The doctor diagnosed radicular pain and prescribed
Skelaxin, a muscle relaxer.

On August 28, 2003, plaintiff saw Rhett McCarty,
Psy.D., a licensed clinical psychologist (Tr. at 223-225).
Plaintiff drove himself to the interview.  Portions of Dr.
McCarty's report are as follows:

> MEDICAL HISTORY:
> Danny had back surgery in 1980 and 1990.  Danny denies
> hospitalization or mental condition, though he has been

22

on antidepressant medication for two years.  Danny was
in drug rehab two years ago.  His drug of choice was
methamphetamine.  He denies using this drug since his
treatment two years ago.

DAILY ACTIVITIES:
Danny rises at 4:30 in the morning.  He retires at 9
p.m.  He shares in the cooking and housecleaning with
his wife.  His wife pays the bills.  Danny's morning
activities consist of housework.  His afternoon
activities consist of walking.  His evening activities
consist of watching television.  Danny says he sleeps
all right now after having antidepressant medication,
but did not sleep well before. . . .  Danny socializes
with family but not outside the family. . . .

FAMILY HISTORY;
Danny married at age 19.  He has been married for 29
years.  He has two children.

LEGAL HISTORY:
Danny was incarcerated and sent to Fulton, Mo. for two
years for methamphetamine.

MENTAL STATUS:
Danny . . . is 5'11" and he weights 214 pounds.  His
speech was relevant and goal directed. . . .  He had a
depressive affect.

MMPI:
Danny took an audio test of the MMPI.  He scored
clinically on the major depression scale and on the
anxiety scale.

DIAGNOSTIC IMPRESSIONS:
Axis I:  Major depression, recurrent; Anxiety disorder,
not otherwise specified
Axis II:  Personality disorder, not otherwise specified
Axis III: Deterioration of the spine
Axis IV:  Unemployment
Axis V:   Current GAF 58[12]

---

[12]A GAF score of 51-60 means moderate symptoms (e.g.,
flat affect and circumstantial speech, occasional panic

23

RECOMMENDATIONS:
1. Psychiatric medication evaluation
2. Individual therapy.

On September 12, 2003, Elissa Lewis, Ph.D., a clinical psychologist, completed a Psychiatric Review Technique (Tr. at 226-239). Dr. Lewis found plaintiff's mental impairment (depression) not severe. She found that plaintiff has no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

In support of her findings, Dr. Lewis wrote the following: "8/28/03 psychological evaluation (for DFS??) by McCarty. Diagnosis based on MMPI - 1st version, was replaced in 1989 with a new test and new norms - thus conclusions would not be valid. No complaints by claimant that would justify the diagnosis, either on DDS form or at the psych. eval., thus no weight is given to the conclusions by the examiner (McCarty). With regard to claimant's cognitive function, the examiner estimated low average to mild mental retardation. Claimant's last earnings (1993)

---

attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

24

were $14,852, so formal intelligence testing will not be
pursued.

"DOC MER:  as of 4/7/03 doing well re: psych
complaints, wants to discontinue prescriptions.  Diagnosis:
meth abuse and depression by history, meth-induced anxiety.
6/10/03 diagnosis:  mood NOS, happy with effects of Pamelor
25 mg HS, 8/4/03 Mood dis. 'much improved'.  MDI Mood NOS
[not otherwise specified]: non-severe as of recent TS note.
Allegations of depression consistent, credible, but no
allegations of limitations due to it, partially credible."

On September 29, 2003, plaintiff saw Ronald Pak, M.D.,
for an initial evaluation for DFS (Tr. at 245-246).
Plaintiff stated that he suffers from back pain which
increases with prolonged sitting but he does not notice it
so much with walking.  Plaintiff was taking Advil and
Skelaxin and was smoking one pack of cigarettes per day.  On
physical exam, plaintiff had negative straight leg raising
on both legs.  He was very tender with palpation across the
low back.  His heart sounds were regular.  Assessment and
Plan:  "Back pain with sciatica [pain in the back of the leg
due to irritation of the sciatic nerve], left greater than
right. . . .  I am endorsing his application for medicate
[sic] because he may have a potentially treatable back

25

problem.  I will need further workup including MRI with

gadolinium [a compound that enhances an MRI] of lumbar

spine."

On October 17, 2003, plaintiff was seen by Charles Ash,

M.D., at the request of Disability Determinations (Tr. at

247-248).  Plaintiff complained of depression.  He said he

smokes one pack of cigarettes per day and takes some sort of

medication for depression but did not know what kind.

Portions of Dr. Ash's report are as follows:

> GENERAL:
> This is a muscular, moderately obese man who stands
> erect and moves about satisfactorily without limp or
> list.  He walks on toes and heels satisfactorily. . . .
> He squats 50 percent normally.  He has moderate
> difficulty arising from the exam table.  He has no
> difficulty arising from the chair, dressing or
> undressing.
>                 * * * * *
>
> HEART:
> Normal sinus rhythm.  No murmurs.
>                 * * * * *
>
> CERVICAL SPINE:
> There is normal motion.  There is no tenderness.  There
> is no muscle spasm or deformity. . . .
>
> THORACIC AND LUMBAR SPINE:
> There is tenderness in the lumbosacral region.  There
> is a small well healed scar in the lumbosacral region.
> There is limited motion.  There is no spasm or
> deformity.  [Plaintiff's right lateral bending, left
> lateral bending, right rotation and left rotation were
> normal.  His flexion was 45 (normal is 90), and
> extension was 10 (normal is 30)].

26

```
UPPER EXTREMITIES:
There is normal range of motion.  There is no weakness,
deformity or atrophy.  Grip and pinch are strong in
both hands. . . .

LOWER EXTREMITIES:
Straight leg raising is 40R 60L. . . .  There is normal
motion of the hips, knees, and ankles.  There is no
weakness, deformity or atrophy. . . .

DIAGNOSIS:
Postoperative status lumbosacral laminectomy[13] with
residual sciatic pain without neurological deficit.

COMMENT:
He can stand and walk and sit six hours in a workday.
He can lift 25 pounds occasionally and 20 pounds
frequently.
```

On October 22, 2003, Rana Mauldin, M.D., completed a

Physical Residual Functional Capacity Assessment (Tr. at

250-257).  Dr. Mauldin found that plaintiff could

occasionally lift 20 pounds, frequently lift ten pounds,

stand or walk for two hours per day, sit for six hours per

day, and had an unlimited ability to push or pull.  In

support of those findings, Dr. Mauldin wrote, "tender to

palpation, positive straight leg raising at 5°, 15°, reports

numbness of legs with prolonged standing, . . . advanced DDD

[degenerative disc disease] L3-L5, . . . spurs, . . . mild

---

[13]Laminectomy is a surgical procedure for treating
spinal stenosis [narrowing] by relieving pressure on the
spinal cord.  The lamina of the vertebra is removed or
trimmed to widen the spinal canal and create more space for
the spinal nerves.

Case 6:05-cv-03211-REL   Document 12   Filed 08/18/06   Page 27 of 61

post. disc herniations L3-L5 with mild stenosis.

3/03 decreased range of motion by 50%

4/03 increased pain with standing 10 minutes

4/03 increased pain with standing and walking

6/03 pain in right leg, walks with difficulty

8/03 pain in lower extremity when standing

9/03 Dr. Pak - pain increases with prolonged sitting and coughing, not so much with walking . . . but negative straight leg raising".

Dr. Mauldin found that plaintiff could frequently balance and kneel, and could occasionally climb, stoop, crouch, or crawl. Plaintiff had no manipulative limitations, such as reaching or handling, and had no visual or communicative limitations. Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery or heights. Dr. Mauldin noted that Dr. Ash's findings were different than hers, and wrote, "inconsistent finding/reports. . . . Since patient has been noted to have some degenerative facet disease and mild spinal stenosis as well as complaints of stand/walk none consistently in [illegible] 'stand/walk' portion of the medical source statement is only given partial weight."

28

Plaintiff was a patient at St. John's Regional Health Center from December 4, 2003, through December 15, 2005 (Tr. at 263-335). Plaintiff suffered a heart attack and went to Breach Medical Center. He was treated in the ER and then transferred to St. John's. Plaintiff's 1- to 1 1/2-pack-per-day cigarette habit was listed as a risk factor of cardiovascular disease. Plaintiff's triglycerides were high at 502 [normal is below 200]. Plaintiff underwent cardiac catheterization and placement of a stent with "excellent result". He was treated for congestive heart failure with daily Lasix[14] and any congestive heart failure symptoms resolved. Plaintiff was also treated for pneumonia and hypoxia [low oxygen]. Plaintiff was discharged on a very low dose of Toprol XL [a beta blocker]. "I discussed activities with him as well as diet and exercise. His activities will be fairly limited until he is seen back in the office in 3 weeks."

On February 17, 2004, plaintiff had his blood drawn (Tr. at 196). His cholesterol was high at 256, his triglycerides were high at 1,104 [normal is below 200].

---

[14]A loop diuretic which increases the amount of salt and water lost in the urine.

On April 13, 2004, plaintiff was seen at the Lebanon Family Practice (Tr. at 287, 295). He weighed 247 pounds. "States he feels very well, denies chest pain or dyspnea [shortness of breath]." Plaintiff's cholesterol was 250, his triglycerides were 452. The doctor increased plaintiff's Lipitor [reduces cholesterol].

On May 25, 2004, plaintiff saw Gary Courter, D.O., for back pain. Plaintiff weighed 252 pounds. Straight leg raising was negative on both legs. Dr. Courter assessed low back pain and prescribed Naprosyn [non-steroidal anti-inflammatory].

On June 7, 2004, plaintiff saw Gary Courter, D.O., for an MRI of the lumbar spine (Tr. at 298). Dr. Courter's impression was:

1. Mild central canal and lateral recess stenosis [narrowing] at L3-4, slightly greater on the right. This may effect the traversing L4 nerve roots. There is also bilateral L3-4 foraminal narrowing.

2. Mild L4-5 disc bulge eccentric to the left with mild mass effect on the left L5 nerve root in the lateral recess and probable minimal mass effect on the left L4 root in the neural foramen[15].

---

[15]"Doorway" through which the spinal nerves leave the spinal canal to spread out into the body.

3.     Mild left L5-S1 intraforaminal protruding disk,
       which abuts the inferior margin of the left L5
       nerve root.

On June 11, 2004, plaintiff saw Gary Courter, D.O., for
back pain and numbness (Tr. at 281-282).  Plaintiff's weight
was 252 pounds.  Straight leg raising was negative on both
legs.  Dr. Courter assessed protruding disc and spinal
stenosis.

C.    *SUMMARY OF TESTIMONY*

During the August 18, 2004, hearing, plaintiff
testified; and George Horne, a vocational expert, testified
at the request of the ALJ.

**1.    Plaintiff's testimony.**

At the time of the hearing, plaintiff was 48 years of
age and is currently 49 (Tr. at 342).  He completed 8th
grade, took special education classes, and he does not have
a G.E.D. (Tr. at 342-343, 350).  Plaintiff cannot read or
write (Tr. at 343).

Plaintiff is 5' 11" tall and weighs 240 pounds (Tr. at
343).  Plaintiff has a driver's license and drove to the
administrative hearing (Tr. at 344).

After plaintiff's alleged onset date, he tried to work
for his brother who has a used car lot (Tr. at 344).
Plaintiff worked for a couple of hours washing cars and was

31

unable to do it because of the pain (Tr. at 344).

Plaintiff had two back surgeries in the past, and he had a heart attack in December 2003 (Tr. at 345). He was prescribed Nitrostat, but he has not had to use it (Tr. at 345). He does get pain in his shoulders, but he just sits down and drinks a glass of water when that happens (Tr. at 345). As long as plaintiff does not bend over a lot, he can pick up the house and start the laundry and he is OK (Tr. at 346). But if he does the dishes, standing still and bending a little bit, the pain gets going and he has to sit down for 25 to 30 minutes (Tr. at 346-347). This happens about five to six times a day (Tr. at 347).

Plaintiff does not sleep well because he tosses and turns and props his feet up trying to get relief from his pain (Tr. at 347).

Plaintiff has difficulty sitting for longer than 20-30 minutes because of pain (Tr. at 353). Plaintiff cannot bend very far, only a few degrees (Tr. at 347). Bending side to side is sometimes easier but sometimes not (Tr. at 347). Plaintiff sometimes goes to Wal-Mart with his wife but his legs start hurting and he has to sit down (Tr. at 348). He will sit for about 30 minutes, then go find his wife and shop some more (Tr. at 348). Plaintiff has never used a

motorized cart in a store (Tr. at 348-349).

Plaintiff testified that he does not need any
medication or assistance for depression or anxiety (Tr. at
351). He said he has been "doing pretty good." (Tr. at
351).

Plaintiff's work experience consists of washing cars
and trucks (Tr. at 349). For a year, he worked as a truck
driver but quit because he could not get a chauffeur's
license because he could not read (Tr. at 349).

Plaintiff has no side effects from his medication (Tr.
at 345).

Plaintiff tries to work out in the yard, he plants
flowers, he tries to mow the yard but it takes him an entire
day (Tr. at 352).

**2.    Vocational expert testimony.**

Vocational expert George Horne testified at the request
of the Administrative Law Judge.

The first hypothetical involved a person who could do
light work; must avoid extremes of temperature, humidity,
and vibration; can only walk on even surfaces; must avoid
exposure to unprotected heights and potentially dangerous or
unguarded moving machinery; and could do no commercial
driving (Tr. at 356). The person would need a low-stress

33

environment with simple, repetitive instructions; no reading or writing other than recognition of simple words and the use of signatures or check marks; and must be able to sit and stand alternately at 30-minute intervals (Tr. at 356-357).

The vocational expert testified that such a person could not do plaintiff's past relevant work (Tr. at 357). The person could, however, work as a production assembler[16] (D.O.T. 706.687-010), with more than 19,000 jobs in Missouri and more than 650,000 in the country (Tr. at 357-358). The person could also work as a small product assembler (D.O.T. 739.687-030), with over 20,000 positions in Missouri and over 680,000 in the country (Tr. at 358).

The next hypothetical was the same as the first, but included a limitation on bilateral and manual dexterity -- "lifting light weight such as dishes would then result in the need for a 20 to 30 minute rest, and this would go on several times a day" (Tr. at 358). The vocational expert testified that the need to rest five or six times per day for 20 to 30 minutes would preclude employment (Tr. at 359).

_____

[16]The Dictionary of Occupational Titles ("DOT") does not address the sit/stand option in these jobs, but in the experience of the vocational expert, these jobs could accommodate a sit/stand option (Tr. at 358).

34

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Linda Carter issued her opinion on November 5, 2004 (Tr. at 16-24).  She noted that plaintiff had filed four previous applications for disability between 1983 and 1992, but all were denied and not appealed (Tr. at 16).  At step one, she found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 17).  At step two, she found that plaintiff suffers from the severe impairments of chronic back pain secondary to spinal stenosis, and obesity (Tr. at 18).  Plaintiff's coronary artery disease is not severe (Tr. at 18).  At step three, the ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 18).  Plaintiff's mental impairment mildly limits his activities of daily living, mildly limits his social functioning, and mildly limits his concentration, persistence, or pace (Tr. at 18).  He has had no episodes of deterioration or decompensation (Tr. at 19).

After analyzing plaintiff's credibility, the ALJ found that he is not entirely credible (Tr. at 20-21).  She found at step four that plaintiff could not return to his past relevant work as an automobile detailer or driver (Tr. at 21).  However, at step five, the ALJ found that plaintiff

could perform the jobs of production assembler and small products assembler, both of which are available in significant numbers in the national and regional economies (Tr. at 22). Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

36

unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The absence of an objective medical basis which
> supports the degree of severity of subjective
> complaints alleged is one factor to be considered in

evaluating the credibility of the testimony and
complaints. . . . The limitations alleged by the
claimant appear to be more of a personal choice rather
than impairment or illness imposed limitations. in
reaching this conclusion it is specifically noted that
no physician has opined that he is unable to work.
Rather Dr. Ash opined that he could lift 25 pounds
occasionally and 20 pounds frequently, and had no other
exertional limitations.

The claimant has a poor work record, with little or no
earnings posted to his record for many years even
before his alleged onset of disability. This
information calls into question his motivation to work,
and the credibility of his testimony.

(Tr. at 20-21).

## 1. *PRIOR WORK RECORD*

The ALJ found that plaintiff has a poor work record

with little or no earnings posted to his record for many

years even before his alleged onset of disability, calling

into question his motivation to work. The record supports

this finding. Plaintiff's earnings record from 1971 through

2004 -- 34 years -- includes 18 years with absolutely no

earnings at all. It also includes one year with a total of

$21.15 earned, four years with less than $600 in earnings,

and two years with barely over $1,000 in earnings. In 1993,

plaintiff earned $14,852.75, which establishes that he is

capable of earning significantly more than he did during

most of his adult life.

38

This factor supports the ALJ's credibility determination.

## 2. DAILY ACTIVITIES

Plaintiff testified that he does laundry, picks up the house, shops at Wal-Mart with his wife without using a motorized cart, works out in the yard, plants flowers, and cuts the grass. In January 2003, plaintiff told his physical therapist that he was "functionally able with activities of daily living." In August 2003, plaintiff told Dr. McCarty that he does cooking and housecleaning, his morning activities consist of housework, his afternoon activities consist of walking, and his evening activities consist of watching television. In October 2003, Dr. Ash observed that plaintiff had no difficulty arising from a chair, dressing, or undressing.

Plaintiff's daily activities are not consistent with his allegations of disability.

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

In April 2003, plaintiff told Dr. Colgan that although he had a history of back problems, he had "no significant pain since '90." That same month, he told nurse Stephanie Noble that he thought he hurt his back two days earlier, but it popped and he felt better. There really is no other

39

specific evidence of duration, frequency, or intensity of symptoms which would relate to plaintiff's credibility.

### 4. *PRECIPITATING AND AGGRAVATING FACTORS*

In May 2002, plaintiff told Dr. Hauenstein that he had been OK until he was forced to climb over seats in a van while restrained. He then felt numbness when standing. In November 2002, plaintiff told nurse Katherine Barton that he bent over to pick up a cigarette and hurt his back. There are no other precipitating or aggravating factors in the record.

### 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

In March 2002, plaintiff complained of pain and numbness in his legs, and he was given over-the-counter ibuprofen. In May 2002, plaintiff was diagnosed with low back pain with radiculopathy and was given Naproxen, an anti-inflammatory. In September 2002, plaintiff was taken off the Trazodone he had been on for about three months to help him sleep, because he believed it was giving him dreams. In December 2002, plaintiff's psychiatrist noted that plaintiff was stable on his medication, and he reported no side effects. In December 2002, plaintiff reported that his current treatment regimen for depression including medication was effective. In January 2003, plaintiff was

40

diagnosed with postural imbalance and post laminectomy
syndrome, and the doctor recommended a lumbar support and
postural balance exercises.  That same month, he reported
that his depression treatment regimen including medication
was effective.  In February 2003, plaintiff was taking
Tylenol for his back pain.  Later that month, he was
assessed with chronic lumbar degenerative joint disease and
the doctor recommended Ibuprofen.  In March 2003, plaintiff
told his psychiatrist that he was doing very well, was not
anxious and was ready for the next reduction in his
depression medication.  The doctor discontinued plaintiff's
Vistaril.  In April 2003, plaintiff was assessed with "pain
and deconditioning" and Dr. Colgan recommended physical
therapy to promote range of motion and trunk strength.

In May 2003, plaintiff told his psychiatrist that he
liked the Pamelor very much and felt it helped with his mood
and back pain.  Plaintiff had no side effects.  Later that
month, plaintiff complained of back pain, and Dr. Sciara
recommended extension and flexion exercises, aerobic
exercises, cessation of smoking, and Tylenol.  In June 2003,
plaintiff told his doctor that Pamelor was working very well
for him, he was sleeping better, and had no adverse effects.
The following month he reported the same, doing well, no

41

side effects. Later that month, plaintiff was seen for his back, and the doctor, assessing chronic lumbar strain, prescribed Naproxen, an anti-inflammatory. In August 2003, plaintiff reported he felt good and was having no side effects from his depression medication. In August 2003, plaintiff was diagnosed with radicular pain and was prescribed Skelaxin, a muscle relaxer. In May 2004, plaintiff was assessed with back pain, and Dr. Courter prescribed Naprosyn, an anti-inflammatory. Finally, plaintiff testified at the administrative hearing that he had no side effects from his medication.

This factor clearly supports the ALJ's credibility assessment. Plaintiff has never been put on strong pain medication, he has been prescribed over-the-counter pain medicines, muscle relaxers, and anti-inflammatories. His medication regimen has been consistently described as effective with no side effects, indicating that plaintiff's symptoms are adequately controlled with minor medications.

## 6. FUNCTIONAL RESTRICTIONS

In March 2002, plaintiff's ambulation was normal, his gait was steady, and he was able to sit and rise from the chair without difficulty, despite his leg pain. In May 2002, plaintiff complained of back pain and leg numbness,

and Dr. Hauenstein restricted plaintiff to no lifting over ten pounds, low bunk assignment in prison, and "low walking"; although there was no duration for these restrictions. In June 2002, Dr. Hauenstein noted that sitting in literacy classes may be a problem for plaintiff; but in the same record, Dr. Kramer noted that plaintiff's symptoms had improved.

In November 2002, Dr. Hauenstein assessed pain in the lower back and legs and recommended that plaintiff put a coat under his knees when supine and between his knees when he is lying on his side. In January 2003, Dr. Hauenstein discussed with plaintiff the need to exercise, told him to go to the gym and work on strengthening his abdominal wall muscles.

In February 2003, nurse Stephanie Noble recommended that plaintiff restrict sports and weight lifting for five days after he said he hurt his back. In May 2003, Dr. Sciara told plaintiff to rest for 72 hours, then begin extension and flexion exercises and aerobic exercises.

In June 2003, nurse Jessica Goppert observed that plaintiff walked without difficulty and had no physical limitations. In September 2003, plaintiff told Dr. Pak that he doesn't have problems with walking. In October 2003, Dr.

43

Ash found that plaintiff could stand, walk, and sit for six hours in a work day, could lift 25 pounds occasionally, and could lift 20 pounds frequently. That same month, Dr. Mauldin found that plaintiff could stand or walk for two hours per day, sit for six hours per day, lift 20 pounds occasionally and ten pounds frequently, and had an unlimited ability to push or pull.

Clearly this factor supports the ALJ's credibility determination. No doctor, treating or consulting, has ever found plaintiff disabled. Plaintiff has never had any major physical restrictions, and no restriction has ever been imposed for more than a very short time.

**B.    *CREDIBILITY CONCLUSION***

In addition to all of the above, I note that in February 2003, plaintiff told a nurse that his back symptoms started in January 2003, despite his alleged onset date being July 1, 1999. I also note that plaintiff filed his application for disability benefits less than a week after being released from prison, suggesting that plaintiff made no attempt to obtain a job once he was free to enter the work force.

Because all of the evidence in the record supports the ALJ's finding that plaintiff is not disabled, the

44

substantial evidence in the record as a whole supports the
ALJ's decision to discredit plaintiff's subjective
allegations of disability.  Therefore, his motion for
summary judgment on this basis will be denied.

## VII. PLAINTIFF'S BACK IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that
plaintiff's back impairment does not meet a listed
impairment, Listing 1.04A, which states as follows:

> Disorders of the spine (e.g., herniated nucleus
> pulposus, spinal arachnoiditis, spinal stenosis,
> osteoarthritis, degenerative disc disease, facet
> arthritis, vertebral fracture), resulting in compromise
> of a nerve root (including the cauda equina) or the
> spinal cord. With:
>
> A.  Evidence of nerve root compression characterized
>     by neuro-anatomic distribution of pain, limitation
>     of motion of the spine, motor loss (atrophy with
>     associated muscle weakness or muscle weakness)
>     accompanied by sensory or reflex loss and, if
>     there is involvement of the lower back, positive
>     straight-leg raising test (sitting and supine).

Specifically, plaintiff argues as follows:

> We must look at the MRI results of June 7, 2004.  At
> L3-4 there is a mild to moderate disc bulge, facet
> degenerative changes contributing to mild canal and
> lateral recess stenosis, at L4-5 a mild disc bulge
> abutting the L5 nerve root in the lateral recess and
> inferior margin of the left L4 nerve root, and at L5-S1
> a disc protrusion that abuts the inferior margin of the
> left L5 nerve root.  This appears to result in
> compromise of a nerve root as specified in the Listing
> quoted above.  Dr. Ash on October 17, 2003, found
> positive SLR [straight leg raising] on both left and
> right.  Dr. Ash did not say whether this was sitting,

45

> supine, or both.  However, to be fair, it must be noted
> at Dr. Pak at Tr. 245 stated that there was negative
> SLR.  Thus, the ALJ was confronted with evidence that
> on one hand was highly suggestive that the Listing were
> met, and on the other hand evidence that the Listings
> were not met, since the second prong of the requirement
> was not present.

(Plaintiff's brief at p. 7).

In order to meet this listing, plaintiff must show at least (1) evidence of nerve root compression, and (2) positive straight leg raising, both supine and sitting.  The record does not reflect the existence of these requirements.

Plaintiff points to the "mild disc bulge abutting the L5 nerve root" as evidence of nerve root compression. However, "disc herniation or bulge [can] cause pain without nerve root compression".  See Symptomatic Disc Bulges and Herniations Without Nerve Root Impingement and Compromise by David J. BenEliyahu, D.C., D.A.C.B.S.P., D.A.A.P.M.  The Chicago Institute of Neurosurgery and Neuroresearch[17] has this to say about disc bulges versus nerve root compression:

> The disc (or intervetebral disc) is a structure that is
> found in between the spinal vertebral bodies from the
> neck to the sacrum (tailbone). The disc serves as a
> cushion and helps the spine to move.  A single disc and
> its two vertebral bodies does not have much ability to
> move, however, when put together along the length of
> the spine, the amount of movement provided is
> considerable.  Each disc is composed of two parts, the

---

[17]See www.cinn.org/spine/herniation-lumbar.html.

nucleus pulposus (the central part) and the annulus
fibrosis (the outer part).  The nucleus pulposus
provides the padding and it is contained by the annulus
fibrosis which forms a ring around the nucleus pulposus
and also attaches to the vertebral bodies above and
below.

Displacement of the disc material can occur centrally
or more commonly, laterally. Lateral disc herniations
are a frequent cause of sciatica (leg pain). This is
called lumbar radiculopathy. The most common low back
disc herniations are located between the 4th and 5th
lumbar vertebral bodies and the 5th lumbar and 1st
sacral vertebral bodies. These levels are also called
L4/5 and L5-S1. . . .

Radiologists and surgeons use a number of different
terms when they refer to disc problems. Herniated disc,
ruptured disc, protruded disc, prolapsed disc and
slipped disc generally all mean the same thing. These
terms imply that the nucleus pulposus has been
displaced backwards and is pressing on a nerve root (or
roots). Disc bulge refers to a general enlargement of
the disc beyond its normal boundary. A disc bulge is
not necessarily an abnormal finding and may simply be
the result of aging. Similarly, the term disc
degeneration (or degenerated disc) is often used,
particularly in MRI reports. This means that there has
been a loss of the fluid content of the disc and
usually a loss of the normal disc height. Again, this
is seen in normal aging. Although disc bulges and disc
degeneration are seen in normal aging, they can both be
associated with clinical problems.

It is clear that a disc bulge is not the same thing as

a compressed nerve.  Therefore, plaintiff's citation to the

MRI showing a mild disc bulge abutting the L5 nerve root

does not establish nerve root compression, as required to

meet the listing.  Additionally, in June 2003, x-rays of

plaintiff's lumbar spine showed that his vertebral bodies

47

and disk spaces were intact, root canals were open without
evidence of any encroachment. This evidence directly
contradicts a suggestion that plaintiff suffers from nerve
root compression as required by the listing.

Neither can plaintiff establish the requisite positive
straight leg raising. On June 23, 1999, straight leg
raising was negative. On May 29, 2002, straight leg raising
was positive at 5 degrees on the right and 15 degrees on the
left; however, there was no mention of this being positive
in both the sitting and supine positions. In June 2002,
plaintiff had positive straight leg raising only on the
left, but again there is no evidence this was sitting and
supine. In January 2003, straight leg raising was negative
on the left and the right. Later that month, plaintiff had
complete active range of motion on both lower extremities.
In July 2003, plaintiff's exam for back and leg pain was
normal. In August 2003, straight leg raising was positive
only on the left. In September 2003, straight leg raising
was negative on both legs. In May 2004, straight leg
raising was negative on both legs. In June 2004, straight
leg raising was negative on both legs.

There is no evidence that plaintiff's back impairment
results in positive straight leg raising, both sitting and

48

supine.  In addition, the fact that plaintiff's straight leg raising is sometimes positive, sometimes negative, results in doubt about the accuracy of those positive results.

Because the substantial evidence in the record as a whole does not establish that plaintiff had nerve root compression or positive straight leg raising, sitting and supine, his motion for summary judgment on the ground that his back impairment met or equaled a listed impairment will be denied.

## VIII. PLAINTIFF'S CARDIAC IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that plaintiff's cardiac impairment does not meet a listed impairment.  Specifically, plaintiff argues that his cardiac impairment meets Listing 4.04C.

In order for plaintiff to show that his impairment matches a Listing, the impairment must meet all specified medical criteria.  <u>Deckard v. Apfel</u>, 213 F.3d 996, 997 (8th Cir. 2000).  Listing § 4.04C requires the following:

> 4.04 Ischemic heart disease, with symptoms due to myocardial ischemia [restriction in blood supply to the heart], as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment (see 4.00B3 if there is no regimen of prescribed treatment), with one of the following:
>
>> C.    Coronary artery disease, demonstrated by angiography (obtained independent of Social

49

Security disability evaluation) or other
appropriate medically acceptable imaging, and in
the absence of a timely exercise tolerance test or
a timely normal drug-induced stress test, an MC,
preferably one experienced in the care of patients
with cardiovascular disease, has concluded that
performance of exercise tolerance testing would
present a significant risk to the individual with
both 1 and 2:

     1.    Angiographic evidence showing:

         a.    50 percent or more narrowing
of a nonbypassed left main coronary
artery, or

         b.    70 percent or more narrowing
of another nonbypassed coronary artery,
or

         c.    50 percent or more narrowing
involving a long (greater than 1 cm)
segment of a nonbypassed coronary
artery, or

         d.    50 percent or more narrowing
of at least two nonbypassed coronary
arteries, or

         e.    70 percent or more narrowing
of a bypass graft vessel, and

     2.    Resulting in very serious
limitations in the ability to independently
initiate, sustain, or complete activities of
daily living.

The evidence in the record establishes that plaintiff

has met neither of the required criteria.

Plaintiff states in his brief that he meets this

listing because in the December 4, 2003, report of Dr. Steve

50

Allyn of St. John's Regional Health Center, Dr. Allyn states
that he stented the circumflex artery but delayed the left
anterior descending ("LAD") artery which showed 75%
stenosis, or narrowing.  Dr. Allyn stated that the LAD was
delayed due to plaintiff's pneumonia and hypoxia.  Plaintiff
further states that, "For reasons not apparent from the
record the plaintiff did not return to St. John's for the
further stenting."

The very first requirement of Listing 4.04C is that the
plaintiff have symptoms due to myocardial ischemia, i.e.,
restriction in blood supply to the heart, as described in
4.00E3 through 4.00E7.

4.00E3 states as follows:

What are the characteristics of typical angina
pectoris? Discomfort of myocardial ischemic origin
(angina pectoris) is discomfort that is precipitated by
effort or emotion and promptly relieved by rest,
sublingual nitroglycerin (that is, nitroglycerin
tablets that are placed under the tongue), or other
rapidly acting nitrates. Typically, the discomfort is
located in the chest (usually substernal) and described
as pressing, crushing, squeezing, burning, aching, or
oppressive. Sharp, sticking, or cramping discomfort is
less common. Discomfort occurring with activity or
emotion should be described specifically as to timing
and usual inciting factors (type and intensity),
character, location, radiation, duration, and response
to nitrate treatment or rest.

The evidence in this case establishes that plaintiff
suffered a heart attack and underwent treatment during his

51

stay at St. John's Regional Health Center.  He was
discharged, and there are no further records establishing
any chest pain, much less pain precipitated by effort or
emotion and promptly relieved by rest or medication.
Plaintiff was discharged from St. John's on December 15,
2005.  Plaintiff had his blood drawn on February 17, 2004.
On April 13, 2004, plaintiff said he felt very well, he
denied chest pain or shortness of breath.  On May 25, 2004,
plaintiff saw Dr. Courter and complained only of low back
pain.  On June 7, 2004, plaintiff saw Dr. Courter, again for
back pain only.  On June 11, 2004, plaintiff saw Dr. Courter
for back pain and numbness.  There are absolutely no
complaints of chest discomfort after plaintiff was
discharged from the hospital, and in the only record dealing
with his heart, plaintiff said he felt very well and denied
chest pain.  Furthermore, plaintiff testified that he was
prescribed Nitrostat, but he had not had to use it.
Therefore, 4.00E3 does not apply.

    4.00E4 states as follows:

    What is atypical angina? Atypical angina describes
    discomfort or pain from myocardial ischemia that is
    felt in places other than the chest. The common sites
    of cardiac pain are the inner aspect of the left arm,
    neck, jaw(s), upper abdomen, and back, but the
    discomfort or pain can be elsewhere. When pain of
    cardiac ischemic origin presents in an atypical site in

the absence of chest discomfort, the source of the pain
may be difficult to diagnose. To represent atypical
angina, your discomfort or pain should have
precipitating and relieving factors similar to those of
typical chest discomfort, and we must have objective
medical evidence of myocardial ischemia; for example,
ECG or ETT evidence or appropriate medically acceptable
imaging.

As described above, plaintiff did complain of back pain

after his release from St. John's; however, there has been

no diagnosis of myocardial ischemia as the cause of that

back pain, and plaintiff did not have an ECG or ETT or any

other appropriate medically acceptable imaging to tie his

back pain to his cardiac impairment.  Therefore, 4.00E4 does

not apply.

4.00E5 states as follows:

What is anginal equivalent? Often, individuals with IHD
[ischemic heart disease] will complain of shortness of
breath (dyspnea) on exertion without chest pain or
discomfort. In a minority of such situations, the
shortness of breath is due to myocardial ischemia; this
is called anginal equivalent. To represent anginal
equivalent, your shortness of breath should have
precipitating and relieving factors similar to those of
typical chest discomfort, and we must have objective
medical evidence of myocardial ischemia; for example,
ECG or ETT evidence or appropriate medically acceptable
imaging. In these situations, it is essential to
establish objective evidence of myocardial ischemia to
ensure that you do not have effort dyspnea due to
non-ischemic or non-cardiac causes.

Again as described above, plaintiff's medical records

indicate that he denied suffering shortness of breath after

his discharge from St. John's. Therefore, 4.00E5 does not

apply.

4.00E6 states as follows:

What is variant angina?
a.   Variant angina . . . refers to the occurrence of
     anginal episodes [severe pain] at rest, especially
     at night, accompanied by transitory ST segment
     elevation (or, at times, ST depression) on an ECG.
     . . .  We will consider variant angina under 4.04
     only if you have spasm of a coronary artery in
     relation to an obstructive lesion of the vessel. .
     . .

b.   Variant angina may also occur in the absence of
     obstructive coronary disease. In this situation,
     an ETT will not demonstrate ischemia. The
     diagnosis will be established by showing the
     typical transitory ST segment changes during
     attacks of pain, and the absence of obstructive
     lesions shown by catheterization. Treatment in
     cases where there is no obstructive coronary
     disease is limited to medications that reduce
     coronary vasospasm, such as calcium channel
     blockers and nitrates. In such situations, we will
     consider the frequency of anginal episodes despite
     prescribed treatment when evaluating your residual
     functional capacity.

c.   Vasospasm that is catheter-induced during coronary
     angiography is not variant angina.

According to the medical evidence discussed above,

there is no evidence that plaintiff had a spasm of a

coronary artery in relation to an obstructive lesion of the

vessel, a diagnosis of variant angina, or vasospasm.

Therefore, 4.00E6 does not apply.

54

4.00E7 states as follows:

What is silent ischemia?
a.   Myocardial ischemia [restriction in blood supply
     to the heart], and even myocardial infarction
     [heart attack], can occur without perception of
     pain or any other symptoms; when this happens, we
     call it silent ischemia. Pain sensitivity may be
     altered by a variety of diseases, most notably
     diabetes mellitus and other neuropathic disorders.
     Individuals also vary in their threshold for pain.

b.   Silent ischemia occurs most often in:

     (i)  Individuals with documented past myocardial
          infarction or established angina without
          prior infarction who do not have chest pain
          on ETT, but have a positive test with
          ischemic abnormality on ECG, perfusion scan,
          or other appropriate medically acceptable
          imaging.
     (ii) Individuals with documented past myocardial
          infarction or angina who have ST segment
          changes on ambulatory monitoring (Holter
          monitoring) that are similar to those that
          occur during episodes of angina. . . .

c.   ST depression can result from a variety of
     factors, such as postural changes and variations
     in cardiac sympathetic tone. In addition, there
     are differences in how different Holter monitors
     record the electrical responses. Therefore, we do
     not consider the Holter monitor reliable for the
     diagnosis of silent ischemia except in the
     situation described in 4.00E7b(ii).

There is no evidence that plaintiff ever wore a Holter

monitor.

Based on the above, I find that plaintiff did not

suffer ischemic heart disease with symptoms due to

myocardial ischemia as described in 4.00E3-4.00E7.

Case 6:05-cv-03211-REL   Document 12   Filed 08/18/06   Page 55 of 61

Therefore, he does not meet Listing 4.04.

Listing 4.04 also requires that the person be on a regimen of prescribed treatment. The Listing refers to 4.00B3 if there is no regimen of prescribed treatment. As the medical records reflect, plaintiff was discharged from St. John's on a very low dose of Toprol XL, a beta blocker. However, he was told to return in three weeks for a follow up, and there is no evidence plaintiff ever returned or continued on any medication or any other treatment for his cardiac impairment.

4.00B3 states as follows:

What if you have not received ongoing medical treatment?

a.   You may not have received ongoing treatment or have an ongoing relationship with the medical community despite the existence of a severe impairment(s). In this situation, we will base our evaluation on the current objective medical evidence and the other evidence we have. If you do not receive treatment, you cannot show an impairment that meets the criteria of most of these listings. . . .

Because plaintiff was not receiving ongoing medical treatment, the ALJ based her evaluation on the current objective medical evidence and the other evidence before her and found that plaintiff's cardiac impairment was not severe; therefore, it could not have met or equaled a listed

56

impairment.

Even if plaintiff had the requisite symptoms due to myocardial ischemia and even if plaintiff additionally was on a regimen prescribed treatment, he still could not meet the additional requirements of Listing 4.04. In addition to the blockage described by plaintiff in his brief, plaintiff must show that the blockage "result[ed] in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living." 4.04C2.

Plaintiff testified that he does laundry, picks up the house, shops at Wal-Mart with his wife without using a motorized cart, works out in the yard, plants flowers, and cuts the grass. Plaintiff's own testimony establishes that he does not have "very serious limitations" in his ability to initiate, sustain, or complete activities of daily living.

Because plaintiff is unable to show most of the requirements for a 4.04C Listing, his motion for summary judgment on this basis will be denied.

## IX. MENTAL TESTS

Plaintiff argues that the ALJ erred in failing to order additional mental tests. Plaintiff quotes the Federal Register: "Presented with insufficient evidence to

57

determine the nature and severity of an individual's mental impairment(s), an administrative law judge must follow our existing rules and seek additional evidence. . . ." August 21, 2000, Volume 65, Number 162, Rules and Regulations, at Page 50759.

I find that the evidence in this record is not insufficient to determine the nature and severity of plaintiff's mental impairment. The evidence clearly establishes that plaintiff's mental impairment is not severe.

In March 2002, plaintiff said he had never received mental health treatment. In September 2002, plaintiff said he was sleeping well, his energy level was appropriate, his anxiety was controlled, he had no hopelessness or worthlessness. In October 2002, plaintiff said he had no mental health issues. In December 2002, plaintiff said he was stable on his medication. His energy level was appropriate, he was able to control and direct his thoughts, reality testing was intact, he had no hallucinations, no delusions, no paranoia. Later that month, plaintiff reported "no mental/emotional issues". In January 2003, plaintiff reported no mental or emotional issues. In March 2003, plaintiff said he did not know why he was on Paxil and

would like to get off all his psych medications. In April 2003, plaintiff was calm and reported doing very well. He was not anxious and was ready for another reduction in medication. In June 2003, plaintiff had no anxiety or restlessness. In July 2003, plaintiff said he was doing well and had "few symptoms of depression." In August 2003, plaintiff said he felt good and the doctor found his mood disorder was much improved.

When plaintiff was discharged from prison, he was provided with a list of Missouri Department of Mental Health designated treatment facilities, complete with addresses and phone numbers. Plaintiff failed to seek any mental health treatment upon his release from prison.

In September 2003, Dr. Lewis, in connection with plaintiff's application for benefits, found that plaintiff's mental impairment was not severe and that he had no restrictions of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

Finally, at the administrative hearing, plaintiff testified that he does not need any medication or assistance for depression or anxiety and that he has been "doing pretty

good."

Sufficient evidence that plaintiff does NOT suffer from a severe mental impairment is not the same thing as insufficient evidence to make a determination. Because the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's mental impairment is not severe, there was no need to order additional mental tests. Defendant's motion for summary judgment on this basis will be denied.

## X.  *COMBINED EFFECT OF PLAINTIFF'S IMPAIRMENTS*

Finally, plaintiff argues that the ALJ erred in failing to properly consider the combined effect of plaintiff's impairments. Plaintiff's argument is based on the orthopedic listing and the cardiac listing, which he claims the ALJ should have found, and the mental impairment which he claims the ALJ erred in finding not severe. Because I have found above that the ALJ did not err in any of these findings, plaintiff's argument regarding the combined effect of plaintiff's impairments is without merit.

## XI.  *CONCLUSIONS*

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 18, 2006

61